1

2

3

4                         UNITED STATES DISTRICT COURT

5                              DISTRICT OF NEVADA

6    LAUSTEVEION JOHNSON,                          3:14-cv-00122-MMD-WGC

7                             Plaintiff,   **REPORT & RECOMMENDATION OF**
                                           **U.S. MAGISTRATE JUDGE**
8         v.

9    ELY STATE PRISON, et. al.,

10                           Defendants.

11

12        This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Defendants' Motion for Summary Judgment. (ECF No. 57.)[1] Plaintiff filed a response

16   (ECF No. 65) and Defendants filed a reply (ECF No. 72). Also before the court is Plaintiff's

17   Motion for Summary Judgment. (ECF No. 62.)  Defendants filed a response (ECF No. 70), and

18   Plaintiff filed a reply (ECF No. 73).

19        After a thorough review, the court recommends that Defendants' motion be denied except

20   insofar as Plaintiff seeks damages against Defendants in their official capacities; and, that

21   Plaintiff's motion be denied.

22                               **I. BACKGROUND**

23        Plaintiff is an inmate incarcerated within the Nevada Department of Corrections

24   (NDOC). (Pl.'s Compl., ECF No. 5.) He is proceeding pro se in this action brought pursuant to

25   42 U.S.C. § 1983. (*Id.*) The events giving rise to this action took place while Plaintiff was housed

26   at Ely State Prison (ESP). (*Id.*)

27

28
_____

    [1] Refers to court's electronic case filing (ECF) number.

1    Defendants are Renee Baker, William Moore, Harold Byrne, James "Greg" Cox, Brea

2 Howard, Julie Matousek, John Nakashima, Charles Schardin, and Harry Peltzer. (*See* ECF No.

3 15 at 3.)

4    Plaintiff was allowed to proceed with a First Amendment free exercise of religion claim

5 in Count I, and a claim under the Americans with Disabilities Act (ADA) in Count III against

6 defendants Baker, Moore, Byrne and Cox. (ECF No. 4.) In connection with these counts,

7 Plaintiff alleges that ESP has a policy that Plaintiff cannot attend Jum'ah services on Fridays for

8 sermons and congregational prayers because he has a "mechanical deficiency in his back and

9 shoulder." (ECF No. 5 at 6.) He avers that general population inmates are permitted to attend

10 Jum'ah services if they have jobs; however, Defendants did not permit Plaintiff, a general

11 population inmate, to attend Jum'ah services because he did not have a job. (*Id.*) Plaintiff told

12 Defendants that, due to his injuries, he would take a less physically challenging job. (*Id.*)

13 Defendants told him that he could not take a less physically challenging job until he worked in a

14 physically challenging job for at least three months. (*Id.*) He alleges he is being denied his right

15 to practice his religion because of his disabilities. (*Id.*)

16    Plaintiff was also allowed to proceed with an Eighth Amendment claim in Count II that

17 defendants Howard, Matousek, and Nakashima were deliberately indifferent to his safety. (*See*

18 ECF No. 7.) He alleges that on February 21, 2012, he resided in Unit 4B, cell 36. (ECF No. 5 at

19 4.) That day, the inmate in Unit 4B, cell 32 had set a fire in front of his cell around 11:30 a.m.

20 (*Id.* at 8.) The fire was ablaze from 11:30 a.m. to 1:30 p.m. (*Id.*) Plaintiff's cell was four doors

21 away. (*Id.*) During the fire, Plaintiff asked Howard, Nakashima, and Matousek if they could open

22 one of the side doors to let some of the smoke out because Plaintiff had started to feel light-

23 headed and dizzy because of smoke inhalation. (*Id.* at 9.) They denied his request. (*Id.*) He asked

24 the officers to call medical for him so he could get oxygen to breathe, and they refused. (*Id.* at 9.)

25 He also avers that the officers had started to pump smoke into the cells through the vents,

26 causing Plaintiff to pass out and severely injure his shoulder. (*Id.*) He filled out an emergency

27 medical grievance, but the officers refused to file it for him. (*Id.*)

28

1    Finally, Plaintiff was permitted to proceed with an Eighth Amendment claim in Count II

2  that defendants Baker, Schardin and Peltzer were deliberately indifferent to his serious medical

3  needs when they denied him pain medication for his shoulder causing him to suffer from

4  shoulder pain for two years. (*See* ECF No. 15 at 2.)

5    Defendants now move for summary judgment. (ECF No. 57.) Plaintiff has also moved for

6  summary judgment. (ECF No. 62.)

7                          **II. LEGAL STANDARD**

8    "The purpose of summary judgment is to avoid unnecessary trials when there is no

9  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

10  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

11  judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

12  525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

13  (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

14  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

15  Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

16  issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

17  250 (1986).

18         A party asserting that a fact cannot be or is genuinely disputed must support the
           assertion by:
19         (A) citing to particular parts of materials in the record, including depositions,
           documents, electronically stored information, affidavits or declarations,
20         stipulations (including those made for purposes of the motion only), admissions,
           interrogatory answers, or other materials; or
21         (B) showing that the materials cited do not establish the absence or presence of a
           genuine dispute, or that an adverse party cannot produce admissible evidence to
22         support the fact.

23  Fed. R. Civ. P. 56(c)(1)(A), (B).

24    If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

25  made on personal knowledge, set out facts that would be admissible in evidence, and show that

26  the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

27    In evaluating whether or not summary judgment is appropriate, three steps are necessary:

28  (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

1   to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

2   *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

3   the outcome of the suit under the governing law will properly preclude the entry of summary

4   judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

5         In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

6   "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

7   come forward with evidence which would entitle it to a directed verdict if the evidence went

8   uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing

9   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

10  *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

11  omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

12  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

13  an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party

14  failed to make a showing sufficient to establish an element essential to that party's case on which

15  that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-

16  25 (1986).

17        If the moving party satisfies its initial burden, the burden shifts to the opposing party to

18  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

20  material fact, the opposing party need not establish a genuine dispute of material fact

21  conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

22  jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*

23  *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation

24  omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the

25  non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith*

26  *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid

27  summary judgment by relying solely on conclusory allegations that are unsupported by factual

28  data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the pleadings

and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

## III. DISCUSSION

### A. Count I-First Amendment Free Exercise of Religion

#### 1. Defendants' Argument

According to Defendants, Plaintiff was restricted from attending Jum'ah religious services in the ESP chapel because he was a disciplinary sanctioned inmate and then a Level 3 high risk inmate. (ECF No. 57 at 4; Sandoval Decl., ECF No. 57- 1 ¶¶ 9-13; Byrne Decl., ECF No. 57-2 ¶¶ 8-17.)[2] They assert that this restriction is applied in a content neutral manner and does not prejudice one religious belief any more than another. (ECF No. 57 at 4.) In addition, Plaintiff had alternative means of exercising religious prayer, such as praying in his cell. (ECF No. 57 at 4.) Next, they contend that the impact of accommodating group worship for high risk Level 3 inmates and those serving disciplinary sanctions would create a substantial strain upon prison resources. (ECF No. 57 at 4.) Fourth, they contend there are no readily available alternatives to the ESP regulation that limits congregational religious services to Level 1 inmates

---

[2] Tasheen Sandoval is a Correctional Casework Specialist III at ESP. (ECF No. 57-1 ¶ 1.) She was Plaintiff's caseworker off and on during 2012 to 2014, while he was housed at ESP. (*Id*. ¶ 8.)

1   that would maintain the safety and security of the institution without stretching staff resources

2   too thin. (ECF No. 57 at 4; Byrne Decl., ECF No. ¶¶ 12-14.)

3        They point out that ESP is a maximum security, closed custody prison, and the inmates

4   there are considered the greatest security and safety risk and have restricted movement. (ECF

5   No. 57 at 10; Byrne Decl., ECF No. 57-2 ¶ 13.) ESP functions on a level system where all

6   inmates who are not serving disciplinary segregation are housed in the general population and

7   their housing designation is a classification based upon their behavior. (Byrne Decl., ECF no. 57-

8   2 ¶ 9.) There are three levels in the inmate housing level classification system, Levels 1, 2, and 3,

9   and an inmate's level is determined by a full classification committee. (ECF No. 57 at 10; Byrne

10   Decl., ECF No. 57-2 ¶ 10; Ex. G, ECF No. 57-14.) According to ESP operational procedures,

11   only inmates classified at Level 1 may have access to the chapel for religious services in groups

12   of not more than twenty. (ECF No. 57 at 10-11; Byrne Decl., ECF No. 57-2 ¶ 11; Ex. G, ECF

13   No. 57-14.) The reason Level 3 inmates and those serving disciplinary sanctions cannot

14   participate in group religious services is to minimize the opportunity for violence by inmates

15   who have demonstrated behavior issues which directly jeopardize institutional safety and

16   security. (Sandoval Decl., ECF No. 57-1 ¶ 13; Byrne Decl., ECF No. 57-2 ¶ 12.)

17        During the time Plaintiff was housed at ESP, he was either classified as a close custody

18   Level 3 inmate or a maximum custody segregation inmate. (ECF No. 57 at 11; Sandoval Decl.,

19   ECF No. 57-1 ¶ 9; Ex. F, ECF No. 57-13.) Throughout his time at ESP, he had a Risk Factor

20   Score (RFS) of 10 or higher in Section A, which rendered him close custody. (Sandoval Decl.,

21   ECF No. 57-1 ¶ 11.) Section A reviews: (1) the history of institutional violence;

22   (2) whether the institutional violence occurred within the last six months; (3) the severity of the

23   current offense; and (4) the prior offense history. (*Id.*) Due to the nature of the disciplinary

24   sanction for which he was sent to ESP, its recent occurrence, and his RFS score, Defendants

25   assert that Plaintiff was not eligible to be housed as a Level 1 or 2 inmate while at ESP, and was

26   not eligible for Level 1 privileges, including attending religious services at the chapel. (*Id.* ¶ 12.)

27        Due to the nature of the behavior of inmates housed at ESP, they are required to be

28   escorted in full restraints by an officer or team of officers whenever they leave their cells. (Byrne

Decl., ECF No. 57-2 ¶ 13.) Inmates attending group religious services must be searched prior to and after attending a group service. (*Id*.) As a result, arranging for and escorting inmates serving segregation sanctions or who are classified as Level 3 to attend group religious services would place an extreme burden on the limited staff resources at ESP which would jeopardize the safety and security of institutional operations. (Byrne Decl., ECF No. 57-2 ¶ 14.) An inmate can improve his level classification by remaining disciplinary free for twelve months, securing an employment assignment, complying with housing rules and procedures and avoiding housing issues with cellmates. (Byrne Decl., ECF No. 57-2 ¶ 15.) During his stay at ESP, Plaintiff was never assigned employment. (Byrne Decl., ECF No. 57-2 ¶ 18.) He was considered for employment in October 2013, but asked to be taken off the job placement list on November 11, 2013. (*Id*.)

### 2. Plaintiff's Argument

Plaintiff is a devout Muslim. (Pl.'s Decl., ECF No. 62-1 at 20 ¶ 1.) According to Plaintiff, Jum'ah is an Islamic sermon by an Imam (religious leader) where the entire congregation of Muslims pray together. (ECF No. 65 at 3, 8; Pl.'s Decl. ECF No. 65 at 29; ECF No. 62 at 3; Pl.'s Decl., ECF No. 62-1 at 20 ¶ 1.) He asserts that Jum'ah is central to the practice of Islam, and as a Muslim he is obliged to attend Jum'ah every Friday. (*Id*.) He claims he was restricted from attending Jum'ah at ESP for three years. (ECF No. 65 at 3, 7, 8; Pl.'s Decl. ECF No. 65 at 30; ECF No. 62 at 1-2; Pl.'s Decl., ECF No. 62-1 at 20 ¶ 1.)

Plaintiff argues that the restriction against him attending Jum'ah was not because of his classification level or disciplinary status. (ECF No. 65 at 5.) He points out that he was never classified as "high risk potential" (HRP). (ECF No. 65 at 9; Pl.'s Decl, ECF No. 65 at 31.) In addition, his RFS score was never high, but always showed him as a moderate risk. (ECF No. 65 at 9.) He points out that Sandoval suspended his disciplinary sanction seven months in, and classified him to general population in August 2012. (*Id*.; Pl.'s Decl, ECF No. 65 at 32.) This is confirmed by Baker's discovery responses, which state that Plaintiff was sent to ESP for long term disciplinary segregation, which he originally served from January 12, 2012, to August 14,

2012, when the remainder of the sanction was suspended. (ECF No. 62 at 56, Baker's response to Pl.'s Interrogatory 9.)

Plaintiff does not dispute that he should not have been allowed to participate in Jum'ah while he was in disciplinary segregation (Pl's Decl., ECF No. 65 at 45), but when he was moved to general population he contends that he should have been able to attend with the other general population inmates. (Pl.'s Decl., ECF No. 65 at 32.) Plaintiff states that ESP has two sides, one side houses Units 1-4, and the other houses Units 5-8. (Pl.'s Decl., ECF No. 65 at 42-43.) Units 1-4 house disciplinary segregation, death row, HRP, and administrative segregation inmates. (*Id*.) Units 5-8 are general population units that include Level 1 and 3 inmates. (*Id*.) He maintains that inmates in Units 5-8 enjoy the same privileges, except that Unit 8 is split into two parts, 8A and 8B, and the inmates in 8B are considered the "workers unit" and get the extra privilege of going to chapel. (*Id*. at 43.) He reiterates that both Level 1 and Level 3 inmates are housed in general population. (*Id*. at 44.)

Plaintiff argues that ESP's operational procedure precluding Level 3 inmates' access to group religious services contradicts NDOC's Administrative Regulations. (ECF No. 62 at 11-12.) He also notes that when he transferred out of HDSP to ESP, he had the same Level 3 classification, and was allowed to attend Jum'ah at HDSP. (Pl.'s Decl., ECF No. 65 at 34.)

Plaintiff disputes that he was provided with alternative means of exercising his religion. (ECF No. 65 at 10.) He acknowledges that he was allowed to pray in his cell, but claims this was not a reasonable alternative to Jum'ah as it is a congregate prayer service (*Id*.; Pl.'s Decl, ECF No. 65 at 31.) He has also has been denied the use of scented oils, Halal meals, the thirty-day Ramadan feast, Eid-al-adha feast, and Taleem classes  (ECF No. 65 at 10.; Pl.'s Decl., ECF No. 65 at 31; Pl.'s Decl., ECF No. 62-1 at 22 ¶ 3.)

He claims that accommodating him would not have created a substantial strain on ESP resources because they accommodate Level 3 inmates attending Jum'ah in other NDOC facilities. (ECF No. 65 at 5.) He disputes that general population inmates at ESP are escorted to the chapel in full restraints. (ECF No. 65 at 5.) He later states that when an inmate is in general population (presumably either Level 1 or Level 3), he is only handcuffed (with no leg restraints),

- 8 -

1  and only one officer is required to escort the inmate. (Pl.'s Decl., ECF No. 65 at 44.)[3] In any

2  event, ESP officers already have to search and escort Level 1 general population inmates to

3  Jum'ah, and would simply have to employ the same process to Plaintiff, who was in the same

4  unit as the Level 1 inmates. (ECF No. 65 at 10-11; Pl.'s Decl., ECF No. 65 at 32.)

5  　　　　Plaintiff argues that as an alternative to precluding Plaintiff from attending Jum'ah as a

6  Level 3 inmate, Defendants could have let him move to Level 1 without a job, since that was the

7  only thing precluding him from advancement to Level 1. (Pl.'s Decl., ECF No. 65 at 32, 45; ECF

8  No. 57-15 at 3.)[4] He also points out that he had requested a less physically challenging job, and

9  that request was denied. (ECF No. 62 at 4.)

10  **3. Analysis**

11  　　　　"The First Amendment, applicable to state action by incorporation through the Fourteenth

12  Amendment ... prohibits government from making a law prohibiting the free exercise [of

13  religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)

14  (citations and quotation marks omitted, alteration original). "The right to exercise religious

15  practices and beliefs does not terminate at the prison door. The free exercise right, however, is

16  necessarily limited by the fact of incarceration, and may be curtailed in order to achieve

17  legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196,

18  197 (9th Cir. 1987) (per curiam); *see also  O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

19  (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Hartmann*, 707 F.3d at 1122; *Shakur v. Schriro*,

20  514 F.3d 878, 883-84 (9th Cir. 2008). To implicate the free exercise clause, a prisoner must

21  establish his belief is both sincerely held and rooted in religious belief. *See Shakur*, 514 F.3d at

22  884-85.

23  　　　　In analyzing the legitimacy of regulation of a prisoners' religious expression, the court is

24  instructed to  afford appropriate deference to prison officials, "'who are actually charged with

---

[3]  This is consistent with ESP OP 735, which states that Level 3 inmates "will be under escort when outside the unit" and in "wrist restraints when escorted outside the unit." (ECF No. 57-14 at 4.)

[4]  He was told he was eligible for Level 1 in a grievance response on October 3, 2013, and that he would be approved for a work assignment when one opened up and then he would be moved to the Level 1 workers' unit. (Pl.'s Decl., ECF No. 65 at 45; ECF NO. 57-15 at 3, .)

1    and trained in the running of the particular institution under examination.'" *O'Lone*, 482 U.S. at

2    349 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). To afford appropriate deference, the

3    applicable legal standard looks at whether the prison regulation at issue "'is reasonably related to

4    legitimate penological interests.'" *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

5         An analysis under *Turner* employs the following factors: (1) "there must be a 'valid,

6    rational connection' between the prison regulation and the legitimate governmental interest put

7    forward to justify it"; (2) "whether there are alternative means of exercising the right that remain

8    open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will

9    have on guards and other inmates, and on the allocation of prison resources generally"; (4) the

10   "absence of ready alternatives" and "the existence of obvious, easy alternatives." *Turner*, 482

11   U.S. at 89-91.

12        Preliminarily, the Supreme Court has recognized that participation in Jum'ah services is

13   mandated by the Muslim religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987)

14   (noting that Jumu'ah is commanded by the Koran, citing Koran 62:9-10). The Supreme Court

15   found: "There is no question that respondents' sincerely held religious beliefs compelled

16   attendance at Jumu'ah." *Id*. As such, there is no doubt that Plaintiff's claim implicates the First

17   Amendment.

18        First, under *Turner*, the regulation at issue must have a logical connection to legitimate

19   governmental interests. *Turner*, 482 U.S. at 89-90.

20        According to Defendants, ESP functions on a level system where all inmates not serving

21   disciplinary segregation are housed in general population and their housing designation is based

22   on their behavior. They are classified as Level 1, 2, or 3. Only Level 1 inmates are allowed direct

23   access to the chapel for religious services in groups of up to twenty. According to Defendants,

24   Level 3 inmates are not allowed this access to the chapel due to safety and security risks. They

25   indicate that inmates at ESP in disciplinary segregation and those classified to Level 3 must be

26   escorted in full restraints by an officer or team of officers whenever they leave their cell, and

27   inmates attending group religious services must be searched for contraband before and after

28   attending the service. Defendants contend that the security measures of arranging for and

1   escorting inmates in segregation or level 3 to attend group religious services would place an

2   extreme burden on the limited staff resources at ESP. Level 3 inmates and those serving

3   disciplinary sanctions are precluded from participating in group religious services to minimize

4   the opportunity for violence by inmates who have demonstrated behavior issues which

5   jeopardize institutional safety and security. During the entirety of his time at ESP, Plaintiff was

6   either in disciplinary segregation or classified to Level 3.

7          Plaintiff acknowledges at one point in his briefing that Level 3 inmates are escorted out

8   of their cell in at least wrist restraints. He does not appear to challenge the fact that to go to

9   chapel, Level 3 inmates would have to be escorted by at least one officer and searched before

10  and after the service. Plaintiff asserts, however, that as a Level 3 inmate he is housed in general

11  population in a unit along with Level 1 inmates, intimating that there is virtually no difference

12  between escorting and searching a Level 1 inmate and a Level 3 inmate before and after group

13  religious services. Plaintiff also points out that other NDOC facilities accommodate Level 3

14  inmates to attend group religious services. Moreover, Plaintiff indicates that the only thing that

15  kept him from advancing to Level 1 was having a job, which he contends he was unable to do

16  because of his health condition. He contends that Defendants refused his requests to assign him

17  to a less physically demanding job so he could transfer to Level 1 and attend Jum'ah. He asserts

18  that he was a "model inmate" during his time at ESP, contradicting Defendants argument that

19  safety and security interests justified excluding him from Jum'ah.

20         On this record, the court finds that a genuine dispute of material fact exists as to whether

21  the penological interests advanced by Defendants are rationally related to the preclusion of Level

22  3 inmates from attending Jum'ah.

23         Second, under *Turner*, the court must look at whether there are "alternative means of

24  exercising the right [that] remain open to prison inmates." *Turner*, 482 U.S. at 89-90. In *O'Lone*,

25  the Supreme Court confirmed that there were no alternative means of attending Jum'ah, as the

26  Muslim religion demands that it occur at a particular time. *O'Lone*, 482 U.S. at 351.

27  Nonetheless, the Supreme Court pointed out that this requirement makes it difficult for prison

28  officials to assure every Muslim inmate can attend. *Id*. The Supreme Court said: "While we in no

1    way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that

2    prison officials are required by the Constitution to sacrifice legitimate penological objectives to

3    that end." *Id*. at 351-52. As a result, the Court instructed that an inquiry should be made as to

4    "whether the inmates were deprived of 'all means of expression.'" *Id*. at 352 (citing *Turner*, 482

5    U.S. at 92. In *O'Lone*, the Supreme Court said it was appropriate to examine whether the inmates

6    "retain the ability to participate in other Muslim religious ceremonies." *Id*. There, the Court

7    found that the record demonstrated the inmates were not "deprived of all forms of religious

8    exercise, but instead freely observe a number of their religious obligations." *Id*. The record

9    revealed that the inmates freely observed many of their religious obligations, including the right

10   to congregate for prayer outside of working hours, access to an imam, the delivery of different

11   meals when pork was served in the prison, special arrangements during the month-long

12   observance of Ramadan with a period of fasting and prayer. *Id*.

13          Defendants assert that Plaintiff has alternative means of exercising his religion because

14   he can pray in his cell. They did not mention any other means by which Plaintiff was able to

15   practice his religion. Plaintiff contends that while he may pray in his cell, he is denied all other

16   meaningful forms of practicing his religion, including attending the congregative prayer service

17   of  Jum'ah, the use of scented oils, Halal meals, the thirty-day Ramadan feast, Eid-al-adha feast,

18   and Taleem classes. He also contends that Muslims get blessings for going to Jumu'ah every

19   week, and are punished if they do not go.

20          Defendants do not address Plaintiff's claims that he was otherwise unable to practice his

21   religion. Therefore, the court finds this factor tips in Plaintiff's favor.

22          Third, under *Turner*, the court must look at the impact accommodation of the inmate's

23   asserted right (to attend Jumu'ah services) would have on other inmates, on prison personnel,

24   and on the allocation of prison resources generally. *Id*. (citing *Turner*, 482 U.S. at 90).

25          As indicated above, Defendants contend that allowing Level 3 inmates to attend Jum'ah

26   would put a strain on prison resources because it would require the additional allocation of staff

27   to escort Level 3 inmates to the chapel and to search the inmates before and after the service.

28

- 12 -

1    Plaintiff asserts that this would simply extend a practice already utilized for Level 1 inmates,

2    who are housed in the same unit as Level 3 inmates.

3    　　　　While Defendants generally conclude that allowing Level 3 inmates to attend Jum'ah

4    would put a strain on resources, they provide no specific discussion about what additional

5    resources would be necessary to accommodate Level 3 inmates attending Jum'ah and how that

6    would impact the prison.  For example, they do not state how many officers are utilized in

7    escorting and searching Level 1 inmates to Jum'ah, how many Level 3 inmates they anticipate

8    would request to attend Jum'ah, how much (if any) additional staffing would be required to

9    accommodate the Level 3 inmates, and what strain this would place on the prison. If for

10   example, there were only a few Level 3 inmates who wished to attend Jum'ah, the impact would

11   likely be minimal. Conversely, if the number of Level 3 inmates who requested to attend Jum'ah

12   was large, the impact would likely be significant.

13   　　　　As a result, the court finds that a question of fact remains as to the impact

14   accommodating Level 3 inmates to attend Jum'ah would have on guards, other inmates and the

15   allocation of prison resources. *See, e.g., Shakur*, 514 F.3d at 887 (general conclusion that impact

16   would be too much was insufficient where prison did not provide evidence suggesting that it

17   actually looked into what providing kosher meals to all Muslim prisoners would entail); *see also*

18   *Hunafa v. Murphy*, 907 F.2d 46, 48 (7th Cir. 1990) ("On this record, which consists essentially

19   of a brief affidavit filed by the prison's food administrator that summarizes the prison's concerns

20   but makes no attempt to estimate their magnitude in relation to the plaintiff's religious claims,

21   the balance is too close for summary judgment to be proper.")

22   　　　　Finally, the court must look at the "absence of ready alternatives" and "the existence of

23   obvious, easy alternatives" to precluding Plaintiff from attending Jumu'ah. "[T]he absence of

24   ready alternatives is evidence of the reasonableness of a prison regulation" while the "existence

25   of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an

26   'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90.  Under this factor, prison

27   officials do not bear the burden of disproving the availability of alternatives. *See O'Lone*, 482

28   U.S. at 350.

1    Defendants conclude there are no ready alternatives to precluding Level 3 inmates from

2    attending Jum'ah. Plaintiff asserts that the only thing standing between him and Level 1 was his

3    ability to get a job, and that Defendants could have either let him pass to Level 1 without a job,

4    or they could have given him a less physically demanding job. The record does reflect that at

5    least around October/November 2013, Defendants were willing to transfer Plaintiff to Level 1 if

6    he took a job in culinary or yard labor. Plaintiff asserts that he withdrew from consideration for

7    these jobs, because he did not think he was physically able to do them, and his requests for less

8    physically demanding jobs were denied. In addition, if there are relatively few Level 3 inmates

9    who request to attend Jum'ah, such that there would be minimal or no strain on prison resources

10   in allowing them to attend, an exception to the policy precluding their attendance could possibly

11   be made.

12   The court finds that a factual dispute remains as to whether there are ready alternatives to

13   the prison's current policy precluding Level 3 inmates from attending Jum'ah.

14   Questions of fact remain as to three out of four of the *Turner* factors. As a result, the

15   court recommends that both Plaintiff's and Defendants' motions for summary judgment be

16   denied as to the First Amendment free exercise claim in Count I.

17   **B. Count III-ADA**

18   **1. Defendants' Argument**

19   Defendants argue that Plaintiff is not a qualified individual with a disability under the

20   ADA, and has no standing to bring a claim under the ADA, as he has no recognized or diagnosed

21   disability. (ECF No. 57 at 7-8; Decl. of Dr. Michael Koehn in 3:12-cv-00538-MMD-WGC, ECF

22   No. 58-1; Decl. of Dr. Romeo Aranas, ECF No. 58-2.) Plaintiff admitted in his deposition he had

23   never been medically diagnosed with a disability or been deemed unfit for work assignments.

24   (ECF No. 57 at 8; Ex. L, ECF No. 57-19 at 71:16-18, 74:13-14.) In addition, on November 11,

25   2013, Plaintiff voluntarily requested to be removed from the job placement list before being

26   assigned a job despite never having been medically classified as unfit for work assignments due

27   to functional limitations. (ECF No. 57 at 8; Ex. E; Byrne Decl., ECF No. 57-2 ¶¶ 16-17; Dr.

28   Aranas Decl., ECF No. 57-19 ¶ 8; Ex. F, ECF No. 57-13.)

1    Defendants assert that employment is only one of several factors used to determine

2    whether an inmate is authorized to attend group religious services. (ECF No. 70 at 4.)

3         **2. Plaintiff's Argument**

4         Plaintiff confirms that this claim is based on the allegation that Plaintiff had physical

5    handicaps in his back, knee and shoulder, and was excluded from participating in Jum'ah from

6    2012 to 2015 because of his handicap. (ECF No. 62 at 8.) Plaintiff asserts that he was told that he

7    could attend Jum'ah if he got a physically challenging job, when Defendants knew he could not

8    work such a job because he had a shoulder and back injury. (ECF No. 65 at 3-4; Pl.'s Decl., ECF

9    No. 65 at 30; ECF No. 62 at 8.) He maintains that he is a qualified individual with a disability,

10   and his medical records prove as much. (ECF No. 65 at 6; ECF No. 62 at 8.)

11        He states that from February 1, 2012 to November 19, 2014, he had multiple disabilities

12   or physical handicaps that substantially limited his ability to walk, lift heavy objects and

13   participate in physically challenging activities. (ECF No. 65 at 19.) Prior to arriving at ESP on

14   February 1, 2012, Plaintiff got into a physical altercation with multiple officers at HDSP on

15   January 1, 2012, which resulted in a limitation in his ability to walk and causing him to fall many

16   times at ESP. (*Id*.; Pl.'s Decl., ECF No. 65 at 30; ECF NO. 62 at 8.) Then, he sustained a left

17   shoulder injury when he passed out due to alleged smoke inhalation on December 21, 2012.

18   (ECF No. 65 at 19-20; ECF No. 62 at 8.) On March 20, 2014, he fell and "blew out" his left

19   knee, causing him extreme pain and to walk with a deep limp. (ECF No. 65 at 20; ECF No. 62 at

20   8.) Plaintiff was subsequently diagnosed with arthritis and atrophy in his left knee and back on

21   September 12, 2014. (ECF No. 65 at 20; Pl.'s Decl., ECF No. 65 at 30; ECF No. 62 at 8.)

22   He asserts that these injuries made it impossible for him to do hard physical labor. (*Id*.)

23        He filed an informal level grievance on August 13, 2013, stating that he had been in

24   general population for five months, and had been denied the right to attend the Friday

25   congregation and prayer service solely because he has a physical disability that prevents him

26   from working, which would allow him to move to unit 8B. (ECF No. 62 at 86, 91-92.) In

27   response he was told:

28        There is a difference in the custody level between you and those that are in the
          workers wing. You are currently classified as a general population level 3 inmate.

- 15 -

> Those on the workers wing are classified as general population level 1 inmates.
> Read OP 738 and OP 736. Per medical the only restrictions you have are that you
> are not fit for NDF and you must be housed at a facility with medical services.
> According to the medical department you have no limiting disability that would
> preclude you from working while housed at ESP. Grievance denied.

(ECF No. 62-1 at 3.)

In the first level grievance, he reiterated that the only way he could attend Jum'ah was if

he was moved to Unit 8B. (*Id.* at 87, 89-90.) He was advised:

> Mr. Johnson you are not being discriminated against. As it was explained to you
> in the informal response, only level 1 inmates have access to the chapel.
> Furthermore, medical states that you do not have any limiting disabilities that
> would preclude you from working in the culinary or on yard labor. If you do not
> wish to work then that is your choice, but this will prevent you from being able to
> go to level 1. Grievance denied.

(ECF No. 62-1 at 2.)

In his second level grievance, he stated he would consider working in yard labor or

culinary in order to attend the Islamic service, but did not want to injure himself further. (*Id.* at

88, 93.) He received this response:

> You are currently in Level 3 GP at ESP and can practice your religious beliefs in
> your cell. However, you were seen at FCC on 10/3/2013 for employment and
> approved for yard labor when an opening occurs. When you are assigned you will
> be moved to level 1 workers unit [where] you can participate in religious services
> in the chapel. Your Request for monetary settlement is denied.

(ECF No. 62-1 at 1.)

On November 11, 2013, Plaintiff sent a kite to Moore, stating that unless he could get

Plaintiff a job as a barber, he wanted to be removed from the job list because he was not

physically able or ready at that time. (ECF No. 62 at 71.) He was advised he was removed from

the wait list. (*Id.*) He claims that he removed himself from the job placement list because he had

been classified for yard labor and did not think he could do that work. (*Id.* at 21; Pl.'s Decl., ECF

No. 65 at 30.) He says that Defendants failed to accommodate him because he asked to do a less

physically challenging job, but this was refused, and he was told he had to start in the kitchen or

with yard labor. (ECF No. 65 at 21-22; Pl.'s Decl., ECF No. 65 at 30.)

On April 27, 2014, he sent a kite to Warden Baker, stating that he was in general

population, but had injuries that prevented him from working. (ECF No. 62 at 66.) He asked if he

could attend Jum'ah on Fridays without having a job. (*Id.*) Baker responded: "You must be in Unit 8B to go to Chapel- Does the doctor have restrictions on you, that prevent you from working?" (*Id.*) He sent a similar kite the same day to Moore, stating that he had been requesting a cane for his back, and for a less physically demanding job but was told he had to start in the kitchen or with yard labor. (ECF No. 62 at 68.) He inquired whether he could be sent to the "other side" without a job so that he could attend the Islamic service, because he could not work due to his injuries. (*Id.*) Moore responded: "You must be assigned to a job to be housed in the workers wing. You have no medical holds listed in NOTIS that would prevent you from working in the culinary or yard labor." (*Id.*)

He sent another kite to Warden Baker on May 1, 2014. (ECF No. 62 at 70.) He told her he did not know if the doctor had placed restrictions on him that prevented him from working, but that the doctor was aware of his back injury and that it was difficult for him to walk, let alone work. (*Id.*) He again asked if it was possible to go to Unit 8B so he could attend the Islamic service without working, because he was not physically able to work. (*Id.*) Baker responded: "Per medical you can work." (*Id.*)

### 3. Analysis

Title II of the ADA "prohibit[s] discrimination on the basis of disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The ADA applies to inmates in prison. *See Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 208-210 (1998) (acknowledging that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')"); *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010) (noting decisions affirming that ADA and RA apply to state prisoners); *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056,

1060 (9th Cir. 2007) (applying ADA and RA to prisoner's claims); *Armstrong v. Wilson*, 124

F.3d 1019, 1023 (9th Cir. 1997); *Duffy v. Riveland,* 98 F.3d 447 (9th Cir. 1996).

"In ADA cases, the plaintiff bears the burden of establishing the elements of the prima

facie case[.]"*Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008). A plaintiff

pursuing a claim under the ADA A must show:

> (1) he "is an individual with a disability;" (2) he "is otherwise qualified to
> participate in or receive the benefit of some public entity's services, programs, or
> activities;" (3) he "was either excluded from participation in or denied the benefits
> of the public entity's services, programs, or activities, or was otherwise
> discriminated against by the public entity;" and (4) "such exclusion, denial of
> benefits, or discrimination was by reason of [his] disability."

*McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (quoting *Thompson v. Davis*,

295 F.3d 890, 895 (9th Cir. 2002) (per curiam)).

The ADA encompasses all services, programs, and activities provided by a prison to its

prisoners. *See, e.g., Armstrong v. Wilson*, 124 F.3d 1019, 1024 (9th Cir. 1997).

A "qualified individual with a disability" is "an individual with a disability who, with or

without reasonable modifications to rules, policies or practices, the removal of architectural,

communication or transportation barriers, or the provision of auxiliary aids and services, meets

the essential eligibility requirements for the receipt of services or the participation in programs or

activities provided by a public entity." 42 U.S.C. § 12131(2).

An individual has a "disability" within the meaning of Title II of the ADA if he has:

"(A) a physical or mental impairment that substantially limits one or more major life activities of

such individual; (B) a record of such impairment; or (C) [is] regarded as having such an

impairment[.]" 42 U.S.C. § 12102(1).

Under the first prong of the disability test, the individual must have a physical or mental

impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A).

Under the ADA's implementing regulations, "physical or mental impairment" means:

> (A) Any physiological disorder or condition, cosmetic disfigurement, or
> anatomical loss affecting one or more of the following body systems:
> neurological, musculoskeletal; special sense organs; respiratory, including speech
> organs; cardiovascular; reproductive; digestive; genitourinary; hemic and
> lymphatic; skin; and endocrine;

(B) Any mental or psychological disorder such as mental retardation, organic
brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 35.104.

"[P]hysical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism." 28 C.F.R. § 35.104.

"Major life activities" means functions such as "caring for one's self, performing manual tasks, seeing, hearing, eating, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 35.104. They also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "It is not possible to include a list of all the specific conditions, contagious and noncontagious diseases, or infections that would constitute physical or mental impairments because of the difficult of ensuring the comprehensiveness of such a list, particularly in light of the fact that other conditions or disorders may be identified in the future." 28 C.F.R. Pt. 35, App. B § 35.104.

When the major life activity under the first test for disability is working, to be substantially limited, the individual must be unable to work in a broad class of jobs. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *overturned on other grounds due to legislative action in* U.S. Pub. L. 110-325 (Jan. 1, 2009); *see also* 29 C.F.R. § 1630.2(j)(3)(1).

First, the court finds that there is a genuine dispute of material fact as to whether Plaintiff suffered from a disability as it is defined under the ADA. Defendants argue that Plaintiff was never medically diagnosed with a disabling condition. Defendants provide declarations from two of Plaintiff's physicians, made in other cases Plaintiff has against these defendants. Dr. Koehn opines that Plaintiff does not require a cane or wheelchair, that he could not objectively

1    substantiate Plaintiff's claims of back pain, and that he is a malingerer. Dr. Aranas, NDOC's

2    current medical director,  reviewed Plaintiff's medical records and states that there is no medical

3    evidence that Plaintiff suffers from a medically diagnosed disability, and he has never been

4    determined to be unfit for work assignments due to functional limitations.

5         Plaintiff, on the other hand, insists that he suffers from conditions involving his back,

6    knee, and shoulder which preclude him from engaging in physically demanding labor. He

7    specifically references that his back condition makes it difficult for him to walk, causing him to

8    fall often. He argues that there were no work restrictions in his medical file because the doctors

9    were not evaluating him for that purpose.

10        Plaintiff is not required to produce specific medical evidence in support of his claim.

11   "Ninth Circuit precedent does not require comparative or medical evidence to establish a genuine

12   issue of material fact regarding the impairment of a major life activity at the summary judgment

13   stage. Rather, our precedent supports the principle that a plaintiff's testimony may suffice to

14   establish a genuine issue of material fact." *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1058

15   (9th Cir. 2005) (citing *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999)).

16        Plaintiff's statements in his declaration that his back condition causes him difficulty

17   walking (a major life activity), and that his back, shoulder and knee condition preclude him from

18   engaging in physically demanding labor (another major life activity) are sufficient to create a

19   genuine issue of material fact as to whether he suffers from a disability under the ADA.

20        Second, there is evidence in the record that Plaintiff was otherwise qualified to move to

21   Level 1 and attend Jum'ah. The grievance response indicates that when Plaintiff secured a job,

22   he would be moved to Level 1 and could start attending Jum'ah services.

23        Third, there is no doubt that Plaintiff was excluded from attending a service or program

24   offered by ESP−the weekly Jum'ah service.

25        Fourth, there is a genuine dispute of material fact as to whether Plaintiff was excluded

26   from attending Jum'ah because of his disability. Defendants maintain that Plaintiff was excluded

27   from attending Jum'ah because of his classification status, which includes many factors, one of

28   which is securing employment. Plaintiff, on the other hand, claims that he was otherwise

1    approved to move to Level 1 except for the fact that he did not have a job, and that his requests

2    to move to Level 1 without a job or with a less physically demanding job were refused.

3          For these reasons, the court recommends that both Plaintiff's and Defendants' motions

4    for summary judgment as to the ADA claim in Count III be denied.

5    **C. Count II-Eighth Amendment Deliberate Indifference to Safety and Medical Needs**

6          **1. Defendants' Argument**

7          On December 21, 2012, defendants Howard and Nakashima were stationed in Unit 4B at

8    ESP. (Howard Decl., ECF No. 57-3 ¶ 7; Nakashima Decl., ECF No. 57-4 ¶ 7.) Howard noticed a

9    fire was started by the inmate housed in cell 32, in front of his cell door, by the inmate pushing

10   paper under his housing door. (Howard Decl., ECF NO. 57-3 ¶ 8.) The fire started at 12:50 p.m.,

11   was small, did not produce much smoke, and was put out within minutes of being started.

12   (Howard Decl., ECF No. 57-3 ¶¶ 7-15; Nakashima Decl., ECF No. 57-4 ¶¶ 8-9; Ex. D,

13   ECF No. 57-11; Matousek Decl., ECF No. 70-1 ¶¶ 8-10.) The fire caused minimal damage to the

14   paint on the base of the door to cell 32, but no injuries were reported. (Howard Decl., ECF No.

15   57-3 ¶ 10.) There was minimal smoke on the tier. (Matousek Decl., ECF No. 70-1 ¶ 11.)  The

16   fire was contained to a small area between the base of the cell door and a metal baseplate

17   installed to prevent inmates from "Cadillacing," which is a method for inmates to transfer items

18   between cells by sliding them under the cell door and sliding them down the tier. (Howard Decl.,

19   ECF No. 57-3 ¶ 11; Nakashima Decl., ECF No. 57-4 ¶ 10.) According to Defendants, inmates

20   often start fires in front of their cell doors at ESP as a form of protest, but the fires generally pose

21   little danger to staff or inmates because they are limited in size and quickly extinguished by staff.

22   (Howard Decl., ECF No. 57-3 ¶ 12; Nakashima Decl., ECF No. 57-4 ¶ 11.) Sergeant Wagner

23   was contacted regarding the fire, and determined that because there was so little smoke, there

24   was no need to open the recreation yard doors. (Matousek Decl., ECF No. 70-1 ¶ 13.)

25         On December 21, 2012, Plaintiff's cell was four doors away from the cell where the fire

26   was ignited. (ECF No. 57 at 6; Ex. A, ECF No. 57-8; Pl's. Depo. Trans., ECF No. 57-19 at

27   19:18-21.) The area where the fire started was small because there is a metal base plate installed

28   to prevent inmates from putting things under their cell doors. (ECF No. 57 at 6; Ex. B, ECF No.

57-9; Nakashima Decl., ECF No. ¶ 10.) This restricts the amount of material that can slide under the door. (ECF No. 57 at 6; Marshall Decl., ECF No. 57-5 ¶¶ 23-24; Howard Decl., ECF No. 57-3 ¶ 11.)[5]

The air ventilation system in the unit supplies air to each cell through a supply vent, comprised of ten percent outside air and ninety percent air drawn from inside the tier through a recirculating air intake vent. (Marshall Decl., ECF No. 57-5 ¶ 6.) The recirculating air vent draws in air from inside Unit 4B and recirculates it with a mix of outside fresh air into the cells. (*Id*. ¶ 8.) The recirculating air vent passes air through the central air handler before it enters the cells. (*Id*.) Each cell in the unit has an exhaust vent, which sucks in air and exhausts it outside the building, and is located on the right or left wall just inside the cell door at a height slightly above the top of the door. (*Id*. ¶ 10.) The system is designed to prevent air from recirculating between cells. (*Id*. ¶ 11.)

Each cell in the unit has an overhead sprinkler system and highly sensitive infrared smoke and air particulate detection system as part of the fire suppression system that is located inside the exhaust vent of each cell and inside the central air handler for each unit. (ECF No. 57 at 6; Marshall Decl., ECF No. 57-5 ¶ 12.) The system is sensitive enough to pick up the slightest bit of particulate or smoke generated inside a cell. (Marshall Decl., ECF No. 57-5 ¶ 13.) The system prevents the recirculation of air which contains smoke or other particulates from inside the unit into the cells. (*Id*. ¶ 14.) In the event of a fire or other triggering of the system, the system causes the central air handler to cut off the fresh air and recirculating air supply and initiates the negative air flow fire exhaust fans. (*Id*. ¶ 15; Ex. K, ECF No. 57-18.) This causes the exhaust vents in the cells to forcefully draw out any smoky air and exhaust it outside the housing unit. (Marshall Decl., ECF No. ¶ 16.) Fresh air is then drawn into the housing unit through the main unit door. (Marshall Decl., ECF No. ¶ 17.)

---

[5] Lance Marshall is employed as the Facility Supervisor II at ESP, who has knowledge of the maintenance, operating and serving procedures for the ESP fire suppression, electrical, plumbing and HVAC systems. (ECF No. 57-5 ¶¶ 1-2.) He also has access to the schematics for the fire suppression, electrical, plumbing and HVAC systems and is familiar with their physical layout in each of the housing units at ESP. (*Id*. ¶ 3.)

If there was a fire in the unit in front of cell 32, if any measurable amount of smoke was generated, the infrared system would be triggered and the smoke would be sucked into cell 32's exhaust vent preventing it from disbursing through the unit and entering other cells. (Marshall Decl., ECF No. ¶¶ 18-19.) If there was smoke inside the unit that entered the recirculating air vent, the system would trigger the fire exhaust fans, causing the smoke to be exhausted outside the unit and not into the cells. (Marshall Decl., ECF No. ¶¶ 11-19.) Similarly, if any measurable quantity of smoke had entered Plaintiff's cell through his door, the system in the exhaust vent, right above his door, would have registered the smoke and triggered the fire exhaust fans, sucking the smoke out of his cell. (Marshall Decl., ECF No. ¶¶ 10-18.) There is no record that the HVAC or fire system was malfunctioning in December of 2012. (*Id.* ¶ 20.)

In his deposition, Plaintiff acknowledged there was no visible smoke in his cell. (ECF No. 57 at 14; Ex. L at 14, 21, 23, 25.) Then, he later stated he could see smoke from the fire outside his cell. (Ex. L at 26, 29, 31-32, 43-45, 93-98.)

Plaintiff admitted in his deposition that he never filed the alleged emergency grievance that he claims Defendants ignored. (ECF No. 57 at 16; Ex. L at 38-40.)

### 2. Plaintiff's Argument

Plaintiff contends that on December 21, 2012, the inmate in cell 32 in his unit set a fire that produced flames and smoke similar to a small camp fire. (ECF no. 65 at 4; Pl.'s Decl., ECF No. 65 at 28-29; ECF No. 62 at 1-2, 6, 84; Pl.'s Decl., ECF No. 62-1 at 21 ¶ 2.) It lasted from approximately 11:30 a.m. to 1:00 p.m. (*Id.*) The fire let off smoke that caused Plaintiff's airways to become constricted, and the tier had a lot of smoke on it. (*Id.*) Plaintiff became dizzy and lightheaded and asked Matousek and Nakashima if they would open the side door to the yard to let some of the smoke out and let fresh air in because it was hard to breathe, and they said no. (*Id.*) Plaintiff pushed his emergency medical button to speak to Howard, and Plaintiff again asked if she could open the door to let out the smoke because he could not breathe, was lightheaded and dizzy, and she also said no. (*Id.*) His condition deteriorated, and he pushed his button again, begging Howard to let him meet with medical and bring an oxygen tank so he could breathe, but she said no. (*Id.*)

1      Plaintiff then submitted an emergency medical grievance begging medical to come and

2  bring him oxygen, but Matousek and Nakashima refused to sign and process it, so Plaintiff never

3  received medical help. (*Id*.) Plaintiff subsequently passed out, hit his shoulder causing an injury,

4  and also injured his throat due to smoke inhalation. (*Id*.) ESP medical staff came to see him

5  around January 6 or 7, 2013, and found he had an "apparent shoulder injury." (ECF No. 65 at 4-

6  5; Pl.'s Decl., ECF No. 65 at 29; Pl.'s Decl., ECF No. 62-1 at 22 ¶ 2.) He was given pain

7  medication. (*Id*.) For his throat, he was instructed to gargle salt. (*Id*.)

8      His grievance, submitted December 30, 2012, corroborates his version of events. (ECF

9  No. 62-1 at 4-9, 12-15.) The grievance responses all state that that staff reported the fire was

10 extinguished within minutes. (ECF No. 62-1 at 10-11, 16.) The investigation detail report from

11 the fire indicates that the fire caused damage to the pain on the cell door as the fire had caused

12 the paint to blister off. (ECF No. 62-1 at 18.)

13     Plaintiff provides a kite he submitted to medical on January 2, 2012 (presumably this

14 should have been dated January 2, 2013), where he references a "massive fire" set a couple of

15 cells away from his on December 21, 2012, which burned for hours. (ECF No. 62 at 67.) He

16 states that the unit correctional officers refused to open the rec-yard door or allow him to see

17 medical, and he passed out and injured his left shoulder. (*Id*.) He requested pain medication for

18 his shoulder, and mentions throat damage as well. (*Id*.) He was advised he would be provided

19 with ibuprofen at pill call on January 7, 2013, and to re-kite the doctor if this was ineffective.

20 (*Id*.) He sent another kite to medical on August 5, 2013, stating that he needed advice on how to

21 heal his throat from heavy smoke inhalation. (ECF No. 62 at 69.) The response states: "When

22 were you exposed to smoke inhalation? Treatment is paramount within the first 48 hours-Are

23 you having any symptoms? Are you needing to be seen by nursing? (*Id*.)

24     Plaintiff asserts that Defendants refused to provide him medical care. (ECF No. 62 at 1.)

25     Plaintiff argues that whatever fire system was in place on December 21, 2012, was

26 ineffective. (ECF No. 65 at 6.) He maintains that the smell of smoke was present in his cell for

27 approximately twenty-four hours. (*Id*.) Howard, Matousek and Nakashima refused to take any

28 measures to minimize the risk to his safety. (*Id*.)

- 24 -

### 3. Analysis

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 932 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

The prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834. Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *Id.* First, "the deprivation alleged must be, objectively, sufficiently serious...; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Id.* (citations and quotations omitted). Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

On the record before it, the court finds that a genuine dispute exists as to various material facts, including the size of the fire, how long it lasted, the amount of smoke that was created, whether Plaintiff passed out, injured his shoulder and suffered a throat injury from smoke inhalation, and whether Defendants ignored his pleas for help and medical attention.

Defendants contend that the fire was small and extinguished within minutes. Plaintiff asserts that the fire was the size of a small camp fire, and was going for approximately an hour and a half. According to Defendants, the fire caused minimal smoke on the tier. Plaintiff asserts that there was enough smoke on the tier and in his cell to cause his lungs to constrict and for him to eventually pass out. Defendants claim there is no evidence Plaintiff suffered any injuries in connection with the fire. Plaintiff maintains that he passed out, and hit his shoulder when he fell,

1    and also suffered damage to his throat from smoke inhalation. He claims that he was eventually

2    seen by medical in January 2013 for his complaints that his shoulder was injured and for injury

3    to his throat due to smoke inhalation. Defendants state that Plaintiff never asked them to open the

4    side door, to get him medical help, or to file an emergency grievance, while Plaintiff claims just

5    the opposite.

6         While Defendants assert that Plaintiff has not provided any admissible evidence in

7    support of his position, he has provided two declarations, based on his observation of the events

8    on December 21, 2012. These statements are certainly admissible. "[D]eclarations are often self-

9    serving, and this is properly so because the party submitting it would use the declaration to

10   support his or her position." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015)

11   (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (holding that district court erred in

12   disregarding declarations as "uncorroborated and self-serving")). "Although the source of the

13   evidence may have some bearing on its credibility, and thus on the weight it may be given by a

14   trier of fact, the district court may not disregard a piece of evidence at the summary judgment

15   stage solely based on its self-serving nature." *Id*. While the court may disregard a self-serving

16   declaration if only based on conclusions, Plaintiff's declarations contain factual statements based

17   on his observations. *See id*.

18        Defendants also assert that the emergency grievance Plaintiff submitted is not

19   authenticated, but he states in both of his declarations that he attempted to have these defendants

20   collect this emergency grievance, but they refused. His statements to that effect are likewise

21   admissible.

22        With many disputed issues of fact, the court recommends that both parties' motions for

23   summary judgment be denied as to the deliberate indifference claim in Count II.

24        In their response to Plaintiff's motion for summary judgment Defendants argue that they

25   are entitled to qualified immunity, but the existence of so many disputed facts precludes the court

26   from making a determination as to qualified immunity at this juncture. *See Serrano v. Francis*,

27   345 F.3d 1071, 1077 (9th Cir. 2003).

28   ///

**D. Peltzer, Schardin or Baker**

Plaintiff points out that Defendants do not mention these defendants or their conduct with respect to Plaintiff's medical care in their motion. (ECF No. 65 at 18.)

That is true, but Plaintiff's motion for summary judgment similarly contains no specific factual statements concerning the conduct of these defendants. He merely states that Defendants denied him medical care.

Neither party has met their burden under Rule 56 with respect to the deliberate indifference claim in Count II. Therefore, both Plaintiff's and Defendants' motions for summary judgment as to the Eighth Amendment deliberate indifference to serious medical needs claim against Peltzer, Schardin and Baker in Count II should be denied.

**E. Miscellaneous Issues**

Plaintiff contends he was not allowed to get the necessary affidavits to support his opposition. (Pl.'s Decl., ECF No. 65 at 35.) Specifically, he mentions he was not able to get copies of affidavits of inmates Robbinson and Jackson who supported Plaintiff's statements regarding the fire, the volume of smoke and requests to open the door due to difficulty breathing. (*Id.*) Defendants assert that he could have filed originals of the declarations and obtained copies thereafter from the clerk. (ECF No. 72 at 2.) It appears that Plaintiff is asserting he could not get copies of these documents, but he did not file a motion alerting the court to this issue. Nor does the court find these affidavits necessary to resolution of these motions. The court has already found, based on Plaintiff's own declarations, that there are genuine disputes regarding various material facts as to this claim.

Next, Plaintiff says he was denied in discovery grievances and medical records at ESP by other inmates regarding throat damage caused by the fire on December 21, 2012, because they were confidential. (Pl.'s Decl., ECF No. 65 at 35.) Plaintiff's remedy was to file a motion to compel, which he did not do. Moreover, the medical records of other inmates are not necessary to prove Defendants were deliberately indifferent to a serious risk to *Plaintiff's* health or safety.

He also states that he was unable to review the declarations of Dr. Koehn and Dr. Aranas because they were filed under seal. (*Id.*) Defendants respond that Plaintiff is familiar with the

1   process of kiting the warden to review the documents filed under seal that were sent there for his

2   review. (ECF N0. 72 at 2.) The court is assigned to many of Plaintiff's cases, and agrees that he

3   is very familiar with the practice of kiting the warden to review documents filed under seal, and

4   in fact, he was advised of that process in this instance in Defendants' motion for leave to file

5   these documents under seal. (*See* ECF No. 56 at 2.)

6   　　　Plaintiff then states that he could not get the Administrative Regulations he needed, but

7   defendants respond that he could have requested these in discovery. (ECF No. 72 at 2.) Plaintiff

8   does not point out what specific regulations he needed, and does not indicate why he did not

9   request them in discovery. Therefore, this argument is without merit.

10   　　　Plaintiff argues that he could not obtain the medical records he needed, but Defendants

11   point out that he could have used a brass slip to have copies made. (ECF No. 72 at 2.)

12   Defendants arranged for Plaintiff to view his medical records at HDSP on March 27, 2015,

13   which he did. (ECF No. 72 at 2 n. 2.) He could have kited to review the records again or sought a

14   court order to do so if he felt he had insufficient time to do so. He did not. If he needed

15   additional funds to copy medical records in connection with this motion, he could have filed a

16   motion to extend his copy work limit. The court does not find any reason to delay issuing a

17   recommendation on these motions based on this argument.

18   　　　Finally, Plaintiff asserts that the deposition transcript does not accurately reflect what he

19   said. (Pl.'s Decl., ECF No. 65 at 35.) Plaintiff points to no specific portion of the transcript that

20   impacts his arguments in connection with this motion. Moreover, he has submitted two

21   declarations in connection with his briefing on these motions which clarify his positions on the

22   issues in this case.

23   **F. Official Capacity & Damages**

24   　　　"[F]ederal courts are barred by the Eleventh Amendment from awarding damages against

25   state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir.

26   2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003)).

27

28

Defendants' motion should be granted insofar as Plaintiff seeks damages against Defendants in their official capacities. Plaintiff also seeks injunctive relief (ECF NO. 5 at 13), and Plaintiff's official capacity claims may proceed in this regard.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order as follows:

(1) **DENYING** Plaintiff's Motion for Summary Judgment (ECF No. 62); and

(2) **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 57) only insofar as Plaintiff seeks damages against Defendants in their official capacities, and **DENYING** Defendants' Motion for Summary Judgment (ECF No. 57) in all other respects.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.


DATED: December 22, 2015.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE